# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
### February 19, 2014 Session

## CITY PRESS COMMUNICATIONS, LLC ET AL.
## V. TENNESSEE SECONDARY SCHOOL ATHLETIC ASSOCIATION

### Appeal from the Chancery Court for Davidson County
### No. 12-240-I    Claudia Bonnyman, Chancellor

### No. M2013-01429-COA-R3-CV - Filed April 30, 2014

The principal issue is whether an association that governs and coordinates interscholastic athletic competition of substantially all public and private secondary schools in Tennessee is the functional equivalent of a government agency for purposes of the Tennessee Public Records Act. Two reporters and their newspaper filed this action pursuant to Tenn. Code Ann. § 10-7-505 to obtain records from the Tennessee Secondary School Athletic Association regarding the enforcement of its bylaws on member schools. The chancery court held that the association was the functional equivalent of a government agency; therefore, it was subject to the Tennessee Public Records Act, codified at Tenn. Code Ann. § 10-7-503 *et seq*. The court also ordered it to produce the records at issue, subject to the redaction of students' names. We affirm.

### Tenn. R. App. P. 3 Appeal as of Right;
### Judgment of the Chancery Court Affirmed and Remanded

FRANK G. CLEMENT, JR., J., delivered the opinion of the Court, in which PATRICIA J. COTTRELL, P.J., M.S., and RICHARD H. DINKINS, J., joined.

Richard L. Colbert and Courtney L. Wilbert, Franklin, Tennessee, for the appellant, Tennessee Secondary School Athletic Association.

John P. Williams, Nashville, Tennessee, for the appellees, City Press Communications, LLC, Steve Cavendish, and Ken Whitehouse.

## OPINION

The Tennessee Secondary School Athletic Association ("the TSSAA") is a private non-profit corporation that governs and coordinates athletic competition among almost all

of Tennessee's secondary schools, both public and private. Created in 1925 and incorporated as a non-profit organization in 1967, the TSSAA is a voluntary association which has approximately 400 member schools in Tennessee; eighty-two percent of its members are public schools.[1]

The TSSAA performs two basic functions. It establishes bylaws or "rules" for interscholastic sports competition and enforces those rules.[2] The TSSAA also sponsors and coordinates numerous post-season championship tournaments in several divisions and classifications for the sports in which member schools compete. Its annual budget is approximately $5,000,000, of which 2% comes from dues paid by the members; the remainder comes primarily from contracts pertaining to post-season championships and gate receipts arising therefrom.

The member schools elect representatives to comprise the governing bodies of the association, which includes a Legislative Council that writes the bylaws and a Board of Control that enforces the bylaws. The members of each body must be either principals, assistant principals, or superintendents of member schools.

The TSSAA bylaw that gave rise to the events at issue is the "financial-aid rule," which requires parents of an interscholastic student to pay the tuition at a school where tuition is charged (private schools) for the student to be eligible to compete in TSSAA competition. Further, any financial aid a student-athlete receives must be based solely on need.

In the spring of 2011, Montgomery Bell Academy ("MBA"), a private school in Nashville, Tennessee, and a member of the TSSAA, removed its head football coach from its coaching staff and voluntarily commenced an internal investigation of alleged improprieties in the conduct of its interscholastic athletic program. The matters at issue pertained to the provision of financial aid to student-athletes that may have violated TSSAA bylaws.

Upon learning of alleged improprieties at MBA, the TSSAA retained counsel to conduct its own investigation to determine whether MBA violated TSSAA bylaws. During

---

[1]The record states that as of May 1, 2012, the TSSAA has 401 member schools of which 329 are public schools and 72 are private schools.

[2]All TSSAA member schools agree to abide by the TSSAA bylaws as a condition for being eligible to participate in TSSAA events.

its investigation, TSSAA's counsel submitted a request for MBA to provide the report resulting from MBA's internal investigation; MBA produced the report to the TSSAA.

In August 2011, *The City Paper*, a Nashville weekly paper published by City Press Communications, LLC ("City Press"), submitted a request pursuant to the Tennessee Public Records Act ("Public Records Act") to the executive director of the TSSAA to inspect records related to the TSSAA's investigation of MBA. The first request was submitted by senior writer Ken Whitehouse on August 22, 2011; he received a reply from TSSAA's counsel but no documents. On January 9, 2012, the editor, Steve Cavendish, submitted a request pursuant to Tenn. Code Ann. § § 10-7-503 to 10-7-516 to view and copy the following records in the possession of the TSSAA:

> 1. A report submitted by Montgomery Bell Academy regarding financial contributions to students/families of the school. Also, any email or written correspondence between MBA officials and TSSAA staff during 2011 pertaining to this subject.
>
> 2. Any and all records, emails and correspondence regarding Montgomery Bell Academy and [its former head football coach] up to his dismissal in April 2011.
>
> 3. Any and all records, emails and correspondence between the TSSAA and member schools regarding possible violations of financial aid rules during the 2011 calendar year.

The TSSAA responded to Mr. Cavendish's letter but again provided no documents. On February 15, 2012, City Press, Mr. Whitehouse, and Mr. Cavendish filed this action to compel the TSSAA to make the documents available for inspection and copying. Plaintiffs contended the documents were "public records" as defined in Tenn. Code Ann. § 10-7-503(a)(1)(A) and "open for personal inspection by any citizen of [Tennessee]" under Tenn. Code Ann. § 10-7-503(a)(2)(A) because the TSSAA was the "functional equivalent" of a governmental entity for numerous reasons, including but not limited to:

> (a) the pervasive entwinement of state school officials in the governing structure of the TSSAA;
>
> (b) the overwhelming predominance of public high schools in the membership of the TSSAA;

(c) the payment of public funds to the TSSAA by public high schools as membership dues, and the TSSAA's receipt of revenues from athletic contests held on public grounds and in public buildings;

(d) the official recognition of the TSSAA by the Tennessee Board of Education in its rules and in numerous ways over the years;

(e) the use of public facilities for many of the athletic contests which are regulated by the TSSAA; and

(f) the performance of a vital regulatory function by the TSSAA which would, in the absence of the TSSAA, be performed by the Board of Education or another government agency.

After discovery, including depositions, the parties filed cross motions for summary judgment. The trial court granted City Press's motion for summary judgment upon the determination that the TSSAA was the functional equivalent of a government agency.

The TSSAA appeals, contending the trial court erred in finding that the TSSAA is the functional equivalent of a government agency. Alternatively, it contends that certain state and federal exemptions apply to protect the documents sought by City Press.

## STANDARD OF REVIEW

The determination of whether the Tennessee Public Records Act applies to the records of the TSSAA is a question of law to be determined by the totality of the circumstances. *Memphis Publishing Co. v. Cherokee Children & Family Services, Inc.*, 87 S.W.3d 67, 74, 79 (Tenn. 2002). This Court determines questions of law de novo, without any presumption of correctness accorded to the trial court's decision. *Id*. at 74. In interpreting the Public Records Act, we must "interpret the terms of the Act liberally to enforce the public interest in open access to the records of state, county, and municipal governmental entities." *Id*.

## ANALYSIS

The Public Records Act serves to promote accountability in government through public oversight of the government's activities, *Cherokee*, 87 S.W.3d at 74, and provides in pertinent part that "[a]ll state, county and municipal records shall, at all times during business hours, . . . be open for personal inspection by any citizen of this state[.]" Tenn. Code Ann. § 10-7-503(a)(2)(A) (2011). The accountability created by the Public Records Act is to be extended in favor of "the fullest possible public access to public records." *Id*. 78-79 (quoting

-4-

Tenn. Code Ann. § 10-7-505(d) (1999)). Thus, although the Public Records Act expressly pertains to "state, county and municipal records," a private entity can become subject to the Act if it's relationship with the government is so extensive that the private entity serves as the functional equivalent of a governmental agency. *Cherokee*, 87 S.W.3d at 78-79. For this reason, our courts have interpreted records "made or received . . . in connection with the transaction of official business by any governmental agency," Tenn. Code Ann. § 10-7-503(a)(1)(A) (2011), to include records in the hands of any private entity which operates as the functional equivalent of a governmental agency. *Cherokee*, 87 S.W.3d at 79. The functional equivalent doctrine, however,

> is not intended to allow public access to the records of every private entity which provides any specific, contracted-for services to governmental agencies. A private business does not open its records to public scrutiny merely by doing business with, or performing services on behalf of, state or municipal government. But when an entity assumes responsibility for providing public functions to such an extent that it becomes the functional equivalent of a governmental agency, the Tennessee Public Records Act guarantees that the entity is held accountable to the public for its performance of those functions.

*Id*.

## I. THE FUNCTIONAL EQUIVALENT OF A GOVERNMENTAL AGENCY

When deciding whether a private entity is the functional equivalent of a governmental agency, our courts look to the totality of the circumstances in each case; this is because no single factor is dispositive. *Cherokee*, 87 S.W.3d at 79. Factors that may be relevant to the functional equivalent analysis include, but are not limited to, "(1) the level of government funding of the entity; (2) the extent of government involvement with, regulation of, or control over the entity; and (3) whether the entity was created by an act of the legislature or previously determined by law to be open to public access." *Id*.

Nevertheless, the cornerstone of the functional equivalent analysis is whether and to what extent the entity performs a governmental or public function; this is of the utmost importance because "a governmental agency cannot, intentionally or unintentionally, avoid its disclosure obligations under the Act by contractually delegating its responsibilities to a private entity." *Id*.

A.

The first factor to consider is the level of government funding of the entity. The TSSAA's annual budget exceeded $5,000,000 in 2010 and 2011, the two years preceding the hearing in this case. Only 2% of TSSAA's revenue comes from the annual dues paid by member schools, while the vast majority of funding comes from contracts and gate receipts at tournament games, many of which are held in public arenas. The trial court found that if the TSSAA did not collect revenue from these tournament games, "the local schools would be collecting the money and spending the money." The trial court concluded that the tournament revenue "in a way is government funding, because it does come from the educational component of the Department of Education that is the athletic program."

The TSSAA argues that it receives no other government funding other than the small portion of annual dues received from public schools. Moreover, while the TSSAA sponsors championships in public facilities, these facilities are arranged by private entities like local chambers of commerce that contract with TSSAA for the opportunity to host these events.

Although the TSSAA does not directly receive "government funding," the TSSAA is the only athletic association the Tennessee State Board of Education has officially recognized and designated as "the organization to supervise and regulate the athletic activities in which the public junior and senior high schools of Tennessee participate on an interscholastic basis." *See* Tennessee State Board of Education, Administrative Rules and Regulations, Rule 0520-1-2-.26 (1972) (later moved to Rule 0520-1-1-.08). It is also the only athletic association whose "rules and regulations" have been expressly approved by the State Board of Education. Moreover, the State Board of Education has recognized the role of the TSSAA in coordinating interscholastic athletic competition and, additionally, expressly authorized the public schools of the state to voluntarily maintain membership in the TSSAA. *See* Tenn. Comp. R. & Regs. 0520-01-02-.08(1)(1998). For the foregoing reasons, we find the evidence does not preponderate against the trial court's finding that revenues from the various championship tournaments, which generate millions, constitute indirect government funding.

B.

The second factor to consider is the extent of government involvement with, regulation of, or control over the private entity. The trial court found that the TSSAA's decision-making authorities consisted of public officials, including public school principals and representatives of public entities, creating substantial government involvement and control.

The two primary governing bodies of the TSSAA are the Legislative Council and the Board of Control. The bylaws state the members of both must be school principals, assistant principals or superintendents. Administrators from public or private schools are eligible to run for election to either body; however, seventeen of the eighteen members of these two governing bodies are public employees.

The Legislative Council writes and recommends revisions to the bylaws, which are the "rules" by which the member schools agree to compete with one another in the various sports. It has nine members; eight of the nine members were employees of public schools at the time of the hearing. The Board of Control is a separate representative group of nine administrators who enforce the bylaws and control all athletic contests in which member schools participate; all nine members of the Board of Control were employees of public schools at the time of the hearing.

In addition, several organizations, including the Tennessee Board of Education and Tennessee Department of Education, appoint ex officio representatives of the Legislative Council and the Board of Control. Other organizations that appoint ex officio representatives include: the Tennessee School Boards Association, Tennessee Organization of School Superintendents, Tennessee Athletic Coaches Association, Tennessee High School Athletic Administrators Association, and the Tennessee Association of Independent Schools. However, none of these ex officio representatives has a vote on any matter coming before the Legislative Council or Board of Control.

The trial court concluded that "because the principals are involved and help make decisions and they are employees of the public school system, then the government involvement with and control over TSSAA is substantial." The TSSAA disagrees, insisting there are no government officials who are employees that actually run its day-to-day operations. The TSSAA relies on *Gautreaux v. Internal Medicine Educ. Foundation, Inc.*, 336 S.W.3d 526 (Tenn. 2011), to contend its circumstances are analogous to those of the non-profit internal medicine education corporation that was found not to be a government agency. *Id*. at 531. The members of that non-profit corporation were required to be faculty members of the state university, *id*. at 530, much like the members of TSSAA's Board of Control and Legislative Council must be administrators of member schools. Despite this similarity, the court in *Gautreaux* found that the state university's control over the non-profit corporation concerned only ministerial tasks, an activity which did not weigh in favor of finding that the non-profit corporation was a governmental agency. *Id*. Here, the Board of Control and Legislative Council have substantial control over the TSSAA; these governing bodies influence and enforce the bylaws of the TSSAA, essentially controlling the TSSAA's purpose - to regulate interscholastic sport competition.

As noted above, the trial court found substantial governmental control existed. For similar reasons, the United States Supreme Court found the TSSAA to be a state actor for constitutional purposes under the Fourteenth Amendment. *Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288 (2001). The Court found that the TSSAA "acts through [public school] representatives, draws its officers from [public schools], is largely funded by their dues and income received in their stead, and has historically been seen to regulate in lieu of the State Board of Education's exercise of its own authority." *Id.* at 290-91. The Court additionally held the TSSAA's "regulatory activity may and should be treated as state action owing to the pervasive entwinement of state school officials in the structure of the association, there being no offsetting reason to see the association's acts in any other way." *Id.* at 291.

For the foregoing reasons, the record fully supports the trial court's finding of substantial government involvement with and control of the TSSAA.

C.

The third factor is whether the entity was created by a legislative act or previously determined to be subject to the Public Records Act. The TSSAA was neither created by a legislative act nor has it been subject to the Public Records Act.

D.

We now turn our attention to the cornerstone of the functional equivalent analysis: whether and to what extent the TSSAA performs a governmental or public function. As the court noted in *Cherokee*, this is of the utmost importance because "a governmental agency cannot, intentionally or unintentionally, avoid its disclosure obligations under the Act by contractually delegating its responsibilities to a private entity." *Cherokee*, 87 S.W.3d at 79.

The trial court found that education is a government function because the Department of Education has "the function of regulating and overseeing the competitive athletic activities of the public schools." The trial court also determined that if the TSSAA was not performing this regulatory function, then the State Board of Education would be supervising and regulating the athletic activities.

The TSSAA attempts to deflect attention from the very important public service it performs by noting that this public service is not expressly mandated by Tennessee law; it also notes that the services it provides are not the product of a contractual obligation with the

government. Further, the TSSAA argues that each school is free to choose whether to include sports in its after-school programs and whether to participate in interscholastic sports competition.

However, the historical relationship between the Board of Education and the TSSAA, as reflected in the Board's rules and regulations, makes it clear that the Board of Education viewed athletic activities in public schools to be one of its functions; otherwise, it would have had no reason, or right, to "designate" the TSSAA as "the organization to supervise and regulate the athletic activities in which the public junior and senior high schools of Tennessee participate on an interscholastic basis." *See* Tennessee State Board of Education, Administrative Rules and Regulations, Rule 0520-1-2-.26 (1972) (later moved to Rule 0520-1-1-.08). Moreover, it is undeniable that education is a government function, and the rule identified below made it clear that the Tennessee State Board of Education viewed the supervision and regulation of athletic activities in public junior and senior high schools of Tennessee as one of its governmental functions.

In 1972, the State Board of Education adopted Rule 0520-1-2-.26 (later moved to Rule 0520-1-1-.08), which officially designated the TSSAA as the organization to regulate interscholastic athletics in Tennessee. The 1972 rule stated in pertinent part:

> The Tennessee State Board of Education recognizes and designates the Tennessee Secondary School Athletic Association as the organization to supervise and regulate the athletic activities in which the public junior and senior high schools of Tennessee participate on an interscholastic basis. The State Board of Education approves the current rules and regulations as stated in the official handbook of the Tennessee Secondary School Athletic Association and reserves the right to review the appropriateness of any future changes.

*Id.*

We recognize, as the trial court did, that the 1972 rule was modified in 1996 following an adverse ruling by a federal district court, which held that the TSSAA was a state actor because its rules were "caused, directed and controlled by the Tennessee Board of Education." *Graham v. Tenn. Secondary Sch. Athletic A'ssn*, No. 1:95-CV-044, 1995 WL 115890, at *5 (E.D. Tenn., Feb. 20, 1995). The 1996 rule reads:

> The State Board of Education recognizes the value of participation in interscholastic athletics and the role of the Tennessee Secondary School Athletic Association in coordinating interscholastic athletic competition. The

State Board of Education authorizes the public schools of the state to voluntarily maintain membership in the Tennessee Secondary School Athletic Association.

Tenn. Comp. R. & Regs. 0520-01-02-.08(1) (1998).

While the 1972 rule expressly afforded the Board of Education official control over the TSSAA with its "right to review the appropriateness of any future changes" to the TSSAA's rules and regulations, the 1996 amendment revised the language so that the Department now merely *recognizes* the value of participation in interscholastic athletics and the role of the TSSAA and *authorizes* the public schools of Tennessee to voluntarily maintain membership in the TSSAA. Although the new rule modified the "official" relationship between the Board of Education and the TSSAA, it had no practical effect on the realities of the relationship in the context of the TSSAA's control of interscholastic athletics in Tennessee. Specifically, it did not diminish the Board of Education's indirect control of the TSSAA, the public schools' participation in the TSSAA, or the public's interest in the TSSAA's role. More importantly, it did not affect the fact that the vast majority of the decision-makers continued to be public officials and representatives of public entities.

In addition, employees of the TSSAA continue to participate in the State of Tennessee Employees Consolidated Retirement Plan pursuant to Tenn. Code Ann. § 8-35-209 (2010). They participated prior to the 1996 amendment, and they continue to participate. Specifically, current and former TSSAA employees continue to accrue and/or receive retirement benefits through the same retirement plan that covers state employees.

With the above facts and circumstances in mind, we look to two important cases for guidance in determining whether the TSSAA operates as the functional equivalent of a governmental agency. In *Cherokee*, the court held that a non-profit corporation that provides privatized services to a governmental entity is subject to the public access requirements of the Tennessee Public Records Act. *Cherokee*, 87 S.W.3d at 70. The only significant distinction between the facts of that case and here is that Cherokee Family Services *contracted* with the Tennessee Department of Human Services to help administer a state-subsidized day care program. *Id*. The parties seeking access to the private entity's records relied on both the Tennessee Public Records Act and provisions in the contracts between the corporation and the state. *Id*. The trial court found that Cherokee Family Services was not a governmental agency, but that all records in its possession were state property pursuant to the contracts between it and the state. *Id*. The court of appeals reversed, holding that the contractual provisions did not render the records public and that Cherokee Family Services was not subject to the Public Records Act. *Id*. The Supreme Court differed and held that Cherokee Family Services "operates as the 'functional equivalent' of a

-10-

governmental (state) agency. . . and that all of its records are subject to the Tennessee Public Records Act and therefore are accessible by the public." *Id*. In its analysis the court noted:

> Scholars have long debated the merits of privatization policies. *Compare* Joseph Caponio and Janet Geffner, *Does Privatization Affect Access to Government Information?*, 5 Gov't Info. Q. 147 (1998) (describing privatization as an efficient management tool when used properly); *with* Shirley L. Mays, *Privatization of Municipal Services: A Contagion in the Body Politic*, 34 Duq. L. Rev. 41 (1995) (asserting that "governments cannot turn over operation of essential government services to private companies without abusing the trust of its citizens and putting them at risk"). Only recently, however, has attention focused upon the ways in which public access to information may be obstructed when governmental functions are transferred to the private sector. As one commentator states, "Privatization may be desirable in itself, but it should not come without . . . leaving public accountability intact. Not only should the public be able to monitor the private company's activities, but the monitoring should be on the same terms as when the public agency was the information vendor." Feiser, *supra*, at 833. Others note that the government may, intentionally or unintentionally, shield records from the public by shifting them to private entities. Indeed, by maintaining and controlling previously public records, private companies may control public access to such records in ways that are "at odds with the very purpose of public records laws." Matthew Bunker and Charles Davis, *Privatized Government Functions and Freedom of Information: Public Accountability in an Age of Private Governance*, 75 Journalism and Mass Comm. Q. 464, 464-68 (1998).

*Id*. at 76-77.

As the holding in *Cherokee* and others cited herein reveal, the public's fundamental right to scrutinize the performance of public services "should not be subverted by government or by private entity merely because public duties have been delegated to an independent contractor," for "[w]hen a private entity's relationship with the government is so extensive that the entity serves as the functional equivalent of a governmental agency, the accountability created by public oversight should be preserved." *Id*. at 78-79. Applying the "functional equivalency" test explained above, the court in *Cherokee* noted:

> While it is true that: (1) Cherokee was privately incorporated rather than created by the legislature; (2) the contracts disavowed any agency relationship between Cherokee and the State; and (3) the parties asserted that the State incurred no tort liability for Cherokee's activities, these considerations are

outweighed by the other factors listed above. Accordingly, we conclude that Cherokee served as the functional equivalent of a governmental agency, and so we hold that the records in Cherokee's possession are subject to public access pursuant to the terms of the Tennessee Public Records Act.

*Id*. at 80.

In its conclusion, the court held that the status of Cherokee Family Services as the functional equivalent of a governmental agency was sufficient to place it within the Tennessee Public Records Act and that records in Cherokee's possession were subject to inspection pursuant to the terms of the Public Records Act. *Id*.

The next significant case, *Gautreaux v. Internal Medicine Educ. Foundation, Inc*., is one which the TSSAA heavily relies upon; however, it is readily distinguishable from the facts of this case and *Cherokee*. The facts of *Gautreaux* involved a non-profit internal medicine education corporation that contracted with the University of Tennessee College of Medicine to pay the university's faculty for teaching services performed for the residency program. *Gautreaux*, 336 S.W.3d at 528. In that case, the court found the private entity was not the functional equivalent of a government agency because the university did not delegate the responsibility to manage or administer its teaching program to the private entity; it merely acted as its bookkeeper. *Id*. at 530. Therefore, the court found that the duties performed by the corporation were merely ministerial, without any discretion given as to their performance. *Id*. at 531.

Based on the foregoing, we have determined that the TSSAA serves as the functional equivalent of a governmental agency, the Tennessee State Board of Education, by directing and managing the extracurricular sporting activities of almost every high school in the state of Tennessee. Therefore, we affirm the trial court's holding that the TSSAA is the functional equivalent of a government agency.

## II. TENNESSEE PUBLIC RECORDS ACT

The Tennessee Public Records Act defines "public record or records" in Tenn. Code Ann. § 10-7-503(a)(1)(A) as follows:

As used in this part . . . "public record or records" or "state record or records" means all documents, papers, letters, maps, books, photographs, microfilms, electronic data processing files and output, films, sound recordings or other

material, regardless of physical form or characteristics, made or received pursuant to law or ordinance or in connection with the transaction of official business by any governmental agency.

Therefore, records *made or received* by the TSSAA *in connection with the transaction of the public's business* is subject to public access pursuant to the terms of the Tennessee Public Records Act. *See* Tenn. Code Ann. § 10-7-503(a)(1)(A) (2011).

The report resulting from MBA's internal investigation, along with numerous documents and statements attached thereto, were obtained by the TSSAA in furtherance of its investigation pursuant to TSSAA bylaws. As a result, the investigation constituted the transaction of the official business of the TSSAA - the governance of interscholastic athletic competition in Tennessee. Thus, the TSSAA *received* MBA's report *in connection with the transaction of* TSSAA's official business. *See* Tenn. Code Ann. § 10-7-503(a)(1)(A) (2011).

The foregoing notwithstanding, the TSSAA contends that some of the records provided by MBA pertained to its financial affairs, which are not public records. Moreover, it asserts that the business conducted with MBA is not the transaction of official government business, but rather business that occurs because of the private contractual relationship between them. We respectfully disagree with both contentions.

The distinction between public and private schools is irrelevant for purposes of this issue because the documents, which may have been confidential and may have remained confidential had MBA not provided them to the TSSAA, lost that status and protection when the records were voluntarily provided to the TSSAA in furtherance of its investigation of possible violations of TSSAA bylaws. The operative fact here is that the TSSAA *received* the documents in connection with the transaction of its business.

Therefore, we have concluded that the documents at issue on appeal are public records and, as such, they are subject to the Tennessee Public Records Act. Whether they are subject to any exemptions or other protections of confidentiality is addressed immediately below.

III. OTHER RIGHTS OF CONFIDENTIALITY

The TSSAA contends the records are confidential under other state and federal exemptions and protected by the attorney work-product doctrine.

It contends the records are confidential pursuant to Tenn. Code Ann. § 10-7-504, which protects records held by educational institutions regarding academic performance, financial status of a student and their family, and medical information. Tenn. Code Ann. §

10-7-504(a)(4)(A) (2013). That section reads as follows:

> The records of students in public educational institutions shall be treated as confidential. Information in such records relating to academic performance, financial status of a student or the student's parent or guardian, medical or psychological treatment or testing shall not be made available to unauthorized personnel of the institution or to the public or any agency, except those agencies authorized by the educational institution to conduct specific research or otherwise authorized by the governing board of the institution, without the consent of the student involved or the parent or guardian of a minor student attending any institution of elementary or secondary education, except as otherwise provided by law or regulation pursuant thereto, and except in consequence of due legal process or in cases when the safety of persons or property is involved. The governing board of the institution, the department of education, and the Tennessee higher education commission shall have access on a confidential basis to such records as are required to fulfill their lawful functions. Statistical information not identified with a particular student may be released to any person, agency, or the public; and information relating only to an individual student's name, age, address, dates of attendance, grade levels completed, class placement and academic degrees awarded may likewise be disclosed.

Because the trial court and this court have determined the TSSAA is the functional equivalent of a governmental agency, the TSSAA asserts that it must be treated in the same fashion; thus, it insists it is entitled to assert the confidentiality defenses of any public educational institution in order to protect the student records in its possession. *See* Tenn. Code Ann. § 10-7-504(a)(4)(A) (2013). City Press counters insisting the statute is inapplicable because the TSSAA is not an educational institution. The trial court determined the TSSAA was not an educational institution as contemplated in the statute.

We agree with the TSSAA's assertion that, since it has been found to be the functional equivalent of a governmental agency, it is entitled to the confidentiality provisions that are applicable to the public function it serves. That does not, however, mean the TSSAA is an educational institution or that it functioned as an educational institution; nor does it lead to the conclusion that the records requested by City Press are "records of students in public educational institutions," as specified in Tenn. Code Ann. § 10-7-504(a)(4)(A) .

The statute states "[t]he records of students in public educational institutions shall be treated as confidential." *Id*. Although the TSSAA contends on appeal that all of the records requested are confidential, it has not specifically identified any particular record or records

at issue that qualify as "a record of a student in a public educational institution," and we are unable to identify any particular record that qualifies for the confidentiality protection under Tenn. Code Ann. § 10-7-504(a)(4)(A).

The TSSAA also contends that 20 U.S.C. § 1232g, the Family Educational Rights and Privacy Act, prohibits an educational agency or institution from permitting the release of educational records or personally identifiable information contained in those records without the written consent of their parents. The term "educational agency or institution" is defined as "any public or private agency or institution which is the recipient of funds under any applicable program." 20 U.S.C.A. § 1232g(a)(3) (2013). The TSSAA has not established that it or MBA received funds from an applicable federal program; thus, this statute is inapplicable to the TSSAA.

Finally, it argues that the documents are protected by the attorney work-product doctrine because the TSSAA attorney prepared these documents in anticipation of litigation. The trial court found that none of the documents City Press sought are the work-product of the TSSAA; rather, "these documents were simply collected by the TSSAA attorney and were not created by or at the direction of the TSSAA attorney." The records at issue are the following documents:

> A. 4/1/11 memo from Chris Simonis to Brad Gioia (MBA headmaster)
> B. Memo from Daniel McGugin (former MBA football coach) describing various accusations shared with Brad Gioia in April 2011
> C. Minutes of 4/21/11 MBA Board of Trustees meeting
> D. 5/23/11 Resolution of MBA Board of Trustees Executive Committee
> E. 8/12/11 letter from Jimmy Webb (Chairman of MBA Board of Trustees) to TSSAA attorney and accompanying Exhibit A (description of situations examined by MBA Review Committee with names omitted)
> F. 8/16/11 letter from MBA attorney to TSSAA attorney and accompanying documents:
> > i. 8/3/11 MBA Review Committee report
> > ii. 8/3/11 Supplement to Report from one Committee member
> > iii. 8/8/11 Response to Supplement
> > iv. Supplemental emails from one Committee member regarding communications post-dating Committee's report
> G. 9/1/11 correspondence from MBA attorney to TSSAA attorney supplying additional information requested by TSSAA attorney
> H. Records obtained from MBA athletic director regarding dissemination of information about TSSAA rule requirements
> I. 9/15/11 minutes of MBA Executive Committee

J. 9/26/11 letter from George McGugin to Jimmy Webb

K. 9/29/11 email from MBA attorney to TSSAA attorney accompanied by sample past-due letters

L. 6/26/11 email from Daniel McGugin to Jimmy Webb with accompanying sheet of additional information regarding tuition payments for MBA student-athletes.

The record before us reveals that the documents identified immediately above were not prepared by or at the direction of the TSSAA's attorney or under his supervision. Instead, the documents were created by or at the request of MBA officials in furtherance of MBA's internal investigation, which were prepared by and/or received by MBA prior to the request from the TSSAA.

To be subject to the work-product doctrine, the documents must have been prepared by or for legal counsel. *See The Tennessean v. Tenn. Dep't of Pers.*, M2005-02578-COA-R3CV, 2007 WL 1241337, at *10 (Tenn. Ct. App. Apr. 27, 2007). None of these documents were prepared by or for the TSSAA's attorney; they were merely provided to the TSSAA in furtherance of its investigation of possible rules violations, which is one of the principal functions of the TSSAA.

### IN CONCLUSION

The judgment of the trial court is affirmed, and this matter is remanded for further proceedings consistent with this opinion. Costs of appeal are assessed against the TSSAA.

_____
FRANK G. CLEMENT, JR., JUDGE