2020 IL App (1st) 190697
No. 1-19-0697
November 30, 2020

FIRST DIVISION

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| BETTER GOVERNMENT ASSOCIATION, | ) | Appeal from the Circuit Court |
| | ) | Of Cook County. |
| Plaintiff-Appellee and Cross-Appellant, | ) | |
| | ) | |
| v. | ) | No. 14 CH 10364 |
| | ) | |
| THE METROPOLITAN PIER AND | ) | |
| EXPOSITION AUTHORITY and NAVY | ) | The Honorable |
| PIER, INC., | ) | Thomas R. Allen, |
| | ) | Judge Presiding. |
| Defendants-Appellants and | ) | |
| Cross-Appellees. | ) | |

PRESIDING JUSTICE WALKER delivered the judgment of the court, with opinion.
Justices Hyman and Coghlan concurred in the judgment and opinion.

**OPINION**

¶ 1     In 2014, the Better Government Association (BGA) sued the Metropolitan Pier and

Exposition Authority (MPEA) and Navy Pier, Inc. (NPI) under the Freedom of Information

Act (FOIA) (5 ILCS 140/1 *et seq.* (West 2014)), seeking records pertaining to the operation of

Navy Pier. The trial court granted summary judgment in favor of BGA on its claim against

MPEA, but after a bench trial, the court entered judgment in favor of NPI on BGA's claims

directed against NPI. MPEA and NPI appeal from the summary judgment entered on the count against MPEA, and BGA cross-appeals from the judgment entered on the counts naming NPI as defendant.

¶ 2 We find that NPI performs a governmental function on the behalf of MPEA and that the documents requested relate directly to that governmental function. Therefore, we affirm the summary judgment entered against MPEA. We also affirm the entry of judgment against BGA on the other counts because the court's finding that NPI did not operate as a subsidiary body of MPEA, within the meaning of the FOIA, is not contrary to the manifest weight of the evidence.

¶ 3                                                        BACKGROUND

¶ 4 In July 1989, the Illinois General Assembly created MPEA to promote and operate expositions and conventions in Chicago and "[t]o carry out or otherwise provide for the recreational, cultural, commercial, or residential development of Navy Pier." 70 ILCS 210/4(b) (West 2014). In May 2010, the General Assembly directed MPEA's trustee, James Reilly, to report to the General Assembly his findings on the issue of whether Navy Pier should remain within the control of the MPEA or serve as an entity independent from the MPEA. Reilly recommended that MPEA should transfer operation of Navy Pier to a private corporation "governed by a civically oriented not-for-profit board."

¶ 5 Some employees and directors of MPEA, along with others, incorporated NPI in 2011 "to support and sustain the operation of Navy Pier, a Chicago Landmark, so as to facilitate the ongoing recreational, cultural and other development of Navy Pier for the benefit of the general public, and all activities incidental or related thereto, including, in particular, maintaining and

operating the grounds, buildings, and facilities of Navy Pier." NPI's bylaws further elaborate its purpose:

> "The Corporation is organized and shall be operated exclusively for civic and charitable purposes, including (a) supporting, sustaining, investing its funds in and for, and lessening the burdens of government related to the operation of Navy Pier, so as to facilitate the ongoing recreational, educational, cultural and other development of Navy Pier for the benefit of the general public, and all activities incidental or related thereto; (b) maintaining, repairing, operating, designing, financing, subleasing, facilities, developing, redeveloping, and/or demolishing the grounds, buildings, facilities, and/or improvements of, and located on, Navy Pier and Gateway Park; and (c) supporting and benefiting the [MPEA] through the development and operation of Navy Pier."

¶ 6　　MPEA leased Navy Pier to NPI for 25 years at $1 per year. The lease required NPI to "offer to the general public free admission to the public portions" of Navy Pier and to operate in accord with a "Framework Plan" that MPEA and NPI would develop together to further the objective of making Navy Pier "a world-class public place that celebrate[s] and showcases the vitality of Chicago, and provides for the enjoyment of Chicago-area residents and visitors, by creating an eclectic mix of public, cultural, recreational, retail, dining, entertainment and other compatible uses attracting a broad-range of visitors, and managed within a business framework that provides for the long-term financial sustainability of Navy Pier."

¶ 7        MPEA granted NPI $220,000 and loaned it $5 million for start-up expenses, and it gave NPI $115 million to use for improvements to the property. MPEA also gave NPI other assets including a number of vehicles.

¶ 8        In 2014, BGA, invoking the FOIA, requested from MPEA and NPI various records relating to the operation of Navy Pier. MPEA supplied some of the documents and said it did not have others in its possession. NPI denied the request claiming that it is not subject to the FOIA.

¶ 9        On June 14, 2014, BGA filed a complaint accusing MPEA and NPI of violating the FOIA. In counts I and III, BGA sought a judgment declaring that NPI served as a public body obliged to respond directly to FOIA requests. In count II, BGA charged MPEA with violating the FOIA on the alternative theory that NPI performed a governmental function on the MPEA's behalf and therefore MPEA had a duty to produce public records in NPI's possession that relate directly to that governmental function.

¶ 10       BGA and MPEA filed motions for summary judgment on count II. In response to MPEA's motion for summary judgment, BGA presented reports that led to the creation of NPI, NPI's tax returns claiming exemption because of its public purpose, hundreds of e-mails between MPEA personnel and NPI personnel, and a letter from the Attorney General concerning BGA's request for NPI documents. The Attorney General said:

"Navy Pier is a publicly-owned property. MPEA has contracted with NPI to operate Navy Pier for the benefit of the public. It is clear that if Navy Pier was currently being operated by MPEA or by the trustee, all records relating to its operation would 'pertain to public business,' for purposes of FOIA, and would be subject to disclosure. The fact that a non-profit entity created for that purpose

4

operates Navy Pier pursuant to contract with MPEA does not change the nature of the operation. Accordingly, the records prepared by or used by NPI in connection with the operation of Navy Pier unequivocally pertain to public business of MPEA, a public entity.

\*\*\*

The operation of Navy Pier—including its beer garden and other facilities—is clearly for the benefit of the public as a tourist attraction, and is therefore a 'governmental function' of MPEA. Thus, the requested records directly relate to that governmental function, which NPI has contracted to perform. Accordingly, we conclude that records in the possession of NPI which are responsive [to] FOIA request[s] must be produced by MPEA under section 7(2) of FOIA."

¶ 11     The trial court held that MPEA hired NPI to perform a governmental function and therefore MPEA had a duty to produce all documents related to NPI's performance of that function. The court then considered the particular documents BGA requested. BGA alleged that MPEA violated the FOIA by refusing BGA's request for:

"1. A list of NPI's employees, titles and salaries since the date NPI was created \*\*\*. 2. A list of all contracts to which NPI is a party, showing the name of the counterparty, the amount of the contract, the date of the contract, and the goods or services purchased \*\*\*. 3. A list of all leases at Navy Pier showing the owners of each business, the date the lease began and the date the lease ended or will end, and the revenue generated \*\*\*. 4. NPI's annual budgets and financial statements since NPI was created. 5. The results of all audits of NPI. 6. Minutes of all NPI

board meetings since NPI was created. 7. All employment contracts governing the employment of any NPI employees. 8. All settlement agreements and employment termination or severance agreements involving NPI. 9. NPI's articles of incorporation and by-laws, including all amendments. 10. All emails sent or received *** by NPI's president/CEO, chief operating officer, board chair, board vice-chair, and/or director of external communications on March 21 or March 22, 2014. 11. All expense reimbursement requests and statements for any credit card, debit card, procurement cards, or other payment mechanisms issued in whole or in part to NPI or MPEA, for NPI's president/CEO dated January 1, 2014 to present. 12. All conflict-of-interest disclosures by any NPI employees or directors. 13. All NPI policies and procedures. 14. All documents related to the $34,490 transaction involving Patrick Gardner reported on Schedule L of NPI's 2011 IRS Form 990."

¶ 12       The trial court held that all the requested documents related to NPI's performance of a governmental function. The court granted summary judgment in favor of BGA for the relief requested in count II of the complaint.

¶ 13       The court then heard evidence on BGA's assertion that NPI counted as a public body. The FOIA defines " '[p]ublic bod[ies]' " as

> "all legislative, executive, administrative, or advisory bodies of the State, state universities and colleges, counties, townships, cities, villages, incorporated towns, school districts and all other municipal corporations, boards, bureaus, committees, or commissions of this State, any subsidiary bodies of any of the foregoing

including but not limited to committees and subcommittees thereof, and a School Finance Authority created under Article 1E of the School Code." 5 ILCS 140/2(a) (West 2014).

¶ 14    The parties agreed that NPI met the definition of "public body" only if it qualified as a "subsidiary bod[y]" of MPEA.

¶ 15    Marilynn Gardner, president of NPI, testified that NPI's board has more than 30 members, and only 3 of those members work for MPEA. After NPI's board approves its budget, the board presents the budget to MPEA. Some items in the budget might require MPEA approval, but MPEA did not generally retain veto power over NPI's decisions. NPI mostly funds its operations from its revenues. Gardner detailed some of the capital improvements NPI made with the $115 million it obtained from MPEA. NPI repaid in full the $5 million MPEA loaned to NPI.

¶ 16    The trial court entered a judgment in favor of NPI on counts I and III of the complaint, holding that NPI did not act as a subsidiary body of MPEA. MPEA and NPI filed an appeal from the summary judgment entered on count II, and BGA filed a cross-appeal from the judgments entered on counts I and III.

¶ 17                                ANALYSIS

¶ 18    We address the appeal of MPEA and NPI first. We review *de novo* the trial court's grant of summary judgment. *Big Sky Excavating, Inc. v. Illinois Bell Telephone Co.*, 217 Ill. 2d 221, 234 (2005). MPEA and NPI contend that NPI does not perform a governmental function within the meaning of the FOIA, and the documents requested do not directly relate to any governmental function NPI might perform.

¶ 19                                                    A. Governmental Function

¶ 20            Section 7(2) of the FOIA provides:

> "A public record that is not in the possession of a public body but is in the possession
>
> of a party with whom the agency has contracted to perform a governmental function
>
> on behalf of the public body, and that directly relates to the governmental function
>
> and is not otherwise exempt under this Act, shall be considered a public record of the
>
> public body, for purposes of this Act." 5 ILCS 140/7(2) (West 2014).

¶ 21            Our supreme court, interpreting the FOIA, defined "governmental function" as "a
government agency's conduct that is expressly or impliedly mandated or authorized by
constitution, statute, or other law and that is carried out for the benefit of the general public."
(Internal quotation marks omitted.) *Better Government Ass'n v. Illinois High School Ass'n*,
2017 IL 121124, ¶ 63 (*IHSA*).

¶ 22            The General Assembly expressly imposed on MPEA the duty "[t]o carry out or
otherwise provide for the recreational, cultural, commercial, or residential development of
Navy Pier." 70 ILCS 210/4(b) (West2014). MPEA delegated to NPI its responsibility for
development of Navy Pier. NPI, in its bylaws, asserts that it

> "shall be operated exclusively for civic and charitable purposes, including (a)
>
> supporting,sustaining, investing its funds in and for, and lessening the burdens of
>
> government relatedto the operation of Navy Pier, so as to facilitate the ongoing
>
> recreational, educational, cultural and     other development of Navy Pier for the
>
> benefit of the general public, and all activities incidental or related thereto; (b)

8

maintaining, repairing, operating, designing, financing, subleasing, facilities, developing, redeveloping, and/or demolishing the grounds, buildings, facilities, and/or improvements of, and located on, Navy Pier and Gateway Park; and (c) supporting and benefiting the [MPEA] through the development and operation of Navy Pier."

¶ 23    Insofar as NPI fulfills the duties the General Assembly assigned to MPEA, by "carry[ing] out or otherwise provid[ing] for the recreational, cultural, commercial or residential development of Navy Pier" (70 ILCS 210/5(c) (West 2014)), NPI performs a governmental function. See *IHSA*, 2017 IL 121124, ¶ 63.

¶ 24    MPEA and NPI argue—at astounding length—that our supreme court did not intend to define "governmental function" in *IHSA* where the court found, " 'governmental function' is defined as 'a government agency's conduct that is expressly or impliedly mandated or authorized by constitution, statute, or other law and that is carried out for the benefit of the general public.' " *IHSA*, 2017 IL 121124, ¶ 63 (quoting Black's Law Dictionary (10th ed. 2014)). If MPEA and NPI mean to argue on policy grounds that courts should not so define "governmental function," they should present the argument to the General Assembly. We apply the definition our supreme court set out in *IHSA*. Because NPI fulfills the duties the General Assembly assigned by statute to MPEA, NPI performs a governmental function.

¶ 25                                B. Directly Related

¶ 26    MPEA and NPI contend that the documents requested do not directly relate to NPI's governmental function. For documents "in the possession of a party with whom the agency has contracted to perform a governmental function on behalf of the public body," section 7(2) of

9

the FOIA limits the FOIA's reach to documents "directly relate[d] to the governmental function [which are] not otherwise exempt under this Act." 5 ILCS 140/7(2) (West 2014). The FOIA does not explain what documents directly relate to a governmental function. *Rushton v. Department of Corrections*, 2019 IL 124552, ¶ 28.

> "[T]he meaning of 'directly relates' must be considered in light of FOIA's policy ***, and also the specific policy and purpose behind section 7(2). *** [S]ection 7(2) was the legislature's response to the privatization of government responsibilities and its impact on the right of public information access and transparency and *** this section ensures that governmental entities must not be permitted to avoid their disclosure obligations by contractually delegating their responsibility to a private entity." (Internal quotation marks omitted.) *Rushton*, 2019 IL 124552, ¶ 28.

¶ 27    If MPEA had itself entered into the employment contracts, vendor contracts, and leases BGA seeks, MPEA would have had a duty to disclose them. See, *e.g.*, *Stern v. Wheaton-Warrenville Community Unit School District 200*, 233 Ill. 2d 396, 405-06 (2009) (employment contracts); *People ex rel. Ulrich v. Stukel*, 294 Ill. App. 3d 193, 204 (1997) (expenditure of public funds); *Mid-America Television Co. v. Peoria Housing Authority*, 93 Ill. App. 3d 314, 316-17 (1981) (leases). Budgets, audit reports, and the other documents requested apparently fall under the general presumption of accessibility for public records, as all the documents relate to NPI operations. NPI established in its bylaws that all its operations fulfill functions assigned to MPEA by statute. See *Baudin v. City of Crystal Lake*, 192 Ill. App. 3d 530, 534-35 (1989). The Attorney General persuasively argued that MPEA could not use the arrangement with NPI to avoid disclosure of the documents BGA requested.

¶ 28        Finally, MPEA and NPI assert that the trial court erred by ordering MPEA to produce all the requested documents "Without Consideration Of Whether The Documents Were Otherwise Exempt From FOIA." Both in the trial court and on appeal, MPEA and NPI have not identified any exemptions applicable to the requested documents. MPEA, as a public body, bears the burden of proving that records requested fall within an exemption. *Chicago Alliance for Neighborhood Safety v. City of Chicago*, 348 Ill. App. 3d 188, 198 (2004). MPEA has not attempted to meet that burden. We affirm the trial court's order granting summary judgment in favor of BGA on count II of the complaint.

¶ 29                                C. Subsidiary Body

¶ 30        BGA contends in its cross-appeal that the trial court erred when it entered judgment in favor of NPI on counts I and III of the complaint, which accused NPI itself of violating the FOIA and which asked the court for a judgment declaring that NPI served as a public body. We will not disturb the trial court's findings of fact unless they are against the manifest weight of the evidence. *Fox v. Heimann*, 375 Ill. App. 3d 35, 46 (2007).

¶ 31        The FOIA statute does not define "subsidiary body." Our supreme court in *IHSA* held that, to determine whether the FOIA applied to an entity as a subsidiary body, the court should consider four factors: "(1) the extent to which the entity has a legal existence independent of government resolution, (2) the degree of government control exerted over the entity, (3) the extent to which the entity is publicly funded, and (4) the nature of the functions performed by the entity." *IHSA*, 2017 IL 121124, ¶ 26. The *IHSA* court added, "no single factor is determinative or conclusive, but as the definition indicates, the key distinguishing factors are government creation and control." *IHSA*, 2017 IL 121124, ¶ 26.

¶ 32                                 1. Independent Legal Identity

¶ 33        The trial court found that Reilly's recommendation to the legislature led to the creation of NPI as a spinoff from MPEA. The trial court said MPEA put "training wheels on the bike" to get NPI started. The court concluded that NPI had a separate legal identity from MPEA as a formally independent corporation, divorced from MPEA in accord with Reilly's recommendation. The trial court's finding that NPI has an independent legal identity was not against the manifest weight of the evidence.

¶ 34                                         2. Control

¶ 35        With respect to the second factor, BGA argues that the restrictions in the lease regarding how NPI can operate Navy Pier amount to governmental control. The testimony of Gardner and the documentary evidence show that MPEA exercised only general supervision under the framework plan. "Such general supervision does not transform the supervised company into a subsidiary of the government." *Rockford Newspapers, Inc. v. Northern Illinois Council on Alcoholism & Drug Dependence*, 64 Ill. App. 3d 94, 97 (1978); see *Hopf v. Topcorp, Inc.*, 256 Ill. App. 3d 887 (1993).

¶ 36        We find useful guidance in *O'Toole v. Chicago Zoological Society*, 2015 IL 118254. The Chicago Zoological Society (Society) was a private nonprofit corporation that controlled the operation of the Brookfield Zoo, a publicly owned property, just as NPI controls daily operations of Navy Pier. NPI, like the Society, purchased its own insurance and made its own employment decisions. The *O'Toole* court said, "The Society's private, nonprofit corporate structure effectively insulates its officers from [the Forest Preserve District of Cook County (District)] control over management decisions. The officers, who handle the zoo's day-to-day

12

operations, owe their positions to the trustees and, indirectly, to the governing members. Among these latter two groups the District enjoys only nominal representation." (Internal quotation marks omitted.) *O'Toole*, 2015 IL 118254, ¶ 28. The court concluded that the District, a unit of local government, did not maintain operational control over the Society, and therefore the Society did not count as a public entity. *O'Toole*, 2015 IL 118254, ¶ 30. Following the reasoning of *O'Toole*, we find that MPEA does not maintain operational control of NPI.

¶ 37    BGA argues that NPI's assertions of tort immunity in other lawsuits count as admissions of government control. However, " '[a] party is not bound by admissions regarding conclusions of law because the courts determine the legal effect of the facts adduced.' " *IHSA*, 2017 IL 121124, ¶ 47 (quoting *JPMorgan Chase Bank, N.A. v. Earth Foods, Inc.*, 238 Ill. 2d 455, 475 (2010)). Courts conclude as a matter of law that tort immunity applies or does not apply. See *Vesey v. Chicago Housing Authority*, 145 Ill. 2d 404, 412 (1991). The assertion of tort immunity does not amount to an admission of fact. BGA presented no evidence that NPI ever asserted that MPEA controlled its operations. The trial court's finding that MPEA does not control NPI accords with the manifest weight of the evidence.

¶ 38                                    3. Public Funding

¶ 39    MPEA gave NPI $220,000 in seed money to cover start-up costs. MPEA loaned NPI $5 million at 0% interest, leased Navy Pier to NPI for $1 per year, and gave NPI property that included vehicles, worth about $2.5 million. MPEA also gave NPI $115 million for capital improvements at Navy Pier. The trial court held that public funding did not count as a factor in favor of finding that NPI operated as a subsidiary body of MPEA.

13

¶ 40    Apart from the funding for capital improvements, MPEA's contributions did not form a large part of NPI's funding. Most of NPI's funds for daily operations came from its revenues from operations and charitable donations it raised without MPEA's assistance. BGA emphasizes the $115 million MPEA gave NPI. We find this case similar to *Hopf*, in which the City of Evanston gave Topcorp funds as part of a plan for Topcorp to develop real estate in Evanston. The *Hopf* court noted that "the majority of the funds that the City has expended were not used to operate [the properties], but instead were used to make infrastructure improvements to the area where the research park is located." *Hopf*, 256 Ill. App. 3d at 896-897. The *Hopf* court found that the public funding did not count as grounds for treating the private corporation as a subsidiary body. Likewise, where the $115 million served to improve the value of MPEA's property, and not to fund NPI's operations, we do not construe the contribution as public funding of NPI. The trial court's finding concerning the public funding factor is not against the manifest weight of the evidence.

¶ 41                            4. Nature of the Functions Performed

¶ 42    The trial court found that NPI performs a governmental function on the MPEA's behalf and that the final factor weighed in favor of finding that NPI acted as a subsidiary body of MPEA. However, the court held that this factor did not outweigh the other factors, which all presented grounds for finding that NPI did not operate as a subsidiary of MPEA. We hold that the manifest weight of the evidence sufficiently supports the trial court's finding that NPI is not a subsidiary body of MPEA within the meaning of the FOIA.

¶ 43                                   CONCLUSION

¶ 44        NPI performs a governmental function on behalf of the MPEA, and the records BGA requested directly relate to NPI's performance of that governmental function. Accordingly, we affirm the trial court's order granting BGA's motion for summary judgment on count II of the complaint. Because NPI is not a subsidiary body of the MPEA, we affirm the trial court's judgment in favor of NPI on counts I and III of the complaint.

¶ 45        Affirmed.

---

**No. 1-19-0697**

---

| | |
|---|---|
| **Cite as:** | *Better Government Ass'n v. Metropolitan Pier & Exposition Authority*, 2020 IL App (1st) 190697 |

---

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 14-CH-10364; the Hon. Thomas R. Allen, Judge, presiding. |

---

| | |
|---|---|
| **Attorneys for Appellant:** | Michele Odorizzi and Joseph M. Callaghan, of Mayer Brown LLP, of Chicago, for appellant Metropolitan Pier & Exposition Authority. |
| | Daniel P. Blondin, of Navy Pier, Inc., William R. Pokorny, of Franczek P.C., and Vincent D. Pinelli and Martin T. Burns, of Burke Burns & Pinelli, Ltd., all of Chicago, for other appellant. |

---

| | |
|---|---|
| **Attorneys for Appellee:** | Matthew Topic, Joshua Burday, and Merrick Wayne, of Loevy & Loevy, of Chicago, for appellee. |

---